# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| Kermit Leaks (#2012-0421058), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13 C 1262 |
| v. | ) | |
| | ) | Judge James B. Zagel |
| | ) | |
| Ed Fowler, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kermit Leaks, an inmate confined at the Cook County Jail ("Jail"), brought this *pro se* 42 U.S.C. § 1983 action against a health care provider at the Jail, Ed Fowler, alleging that Fowler was deliberately indifferent to his serious medical needs. Before the Court are Defendant's motion for summary judgment and Plaintiff's motion in response to Defendant's motion for summary judgment. For the reasons stated below, Plaintiff's motion in response is stricken as a pending motion; Defendant's motion for summary judgment is denied. The Court also exercises its discretion to recruit counsel for Plaintiff. Recruited counsel may contact chamber's Courtroom Deputy if he/she is interested in appearing for any future status or motion hearings via video conference.

## Background

The Court begins with a discussion of the rules applicable to the summary judgment filings. Northern District of Illinois Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation

omitted). Under Local Rule 56.1(a)(3), the moving party must provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (quoting N.D. Ill. L.R. 56.1(a)); *see also* Fed. R. Civ. P. 56(c). The opposing party must then "file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Cracco v. Vitran, Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (quoting N.D. Ill. L.R. 56.1(b)(3)(B)). The opposing party may also present a separate statement of additional facts that requires the denial of summary judgment. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008) (citing N.D. Ill. L.R. 56.1(b)(3)(C)).

A court may consider true any uncontested fact in the movant's Rule 56.1 Statement that is supported by the record and is not addressed by the opposing party. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006); *see also* Fed. R. Civ. P. 56(e)(2); Local Rule 56.1(b)(3)(C). "District courts are entitled to expect strict compliance with Rule 56.1." *Ciomber*, 527 F.3d at 643 (citations and internal quotation marks omitted). A plaintiff's *pro se* status does not excuse him from complying with these rules. *Greer v. Bd. of Educ. of City of Chicago,* 267 F.3d 723, 727 (7th Cir. 2001); *Cady v. Sheahan,* 467 F.3d 1057, 1061 (7th Cir. 2006) ("[E]ven *pro se* litigants must follow rules of civil procedure.").

Here, as contemplated by Local Rule 56.1, Defendant Fowler filed a statement of uncontested material facts supporting summary judgment in his favor. (Defs. Stmt. of Fact, R. 53 ("Def. SOF"). In response to the Court's order, Defendant filed a status report providing pages missing from their original filing. (R. 77.) With the exception of one fact, *see* Def. SOF ¶ 7,

each factual assertion in Defendant's Local Rule 56.1(a)(3) statement cites supporting evidentiary material in the record, which consists of Leaks' excerpted medical records (R. 53-2), and the transcript of his deposition (R. 53-1). Defendant also filed and served on Leaks a Local Rule 56.2 Notice, which explains in detail the requirements of Local Rule 56.1. (R. 55.)

Leaks did not file any direct response to Defendant's statement of uncontested facts or a statement of additional uncontested facts, as contemplated by Local Rule 56.1(b)(3)(B)-(C). Leaks did, however, submit several items in response to Defendant's motion, a "motion in response to Defendant's motion for summary judgment" and a "memorandum of law in support of Plaintiff's motion to deny Defendant's motion for summary judgment." (R. 64, 74.) Leaks attached several duplicative medical records to his memorandum.

Leaks' failure to comply with Local Rule 56.1 does not, however, "automatically result in judgment for the movant," as "[t]he ultimate burden of persuasion remains with [the movant] to show that [he] is entitled to judgment as a matter of law." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). Where Leaks has pointed to evidence contrary to Defendants' statements of fact in his submissions, the Court will consider that evidence. The Court also will, in general, incorporate Plaintiff's factual assertions to the extent they provide additional facts relevant to the Court's analysis, are supported by record evidence, or are such that Leaks properly could testify as to them at trial. The Court will not, however, dig through the record to identify disputed issues of fact. *See Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) ("In considering a motion for summary judgment, the district court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with

reasonable particularity the evidence upon which the party relies."). With these guidelines established, the Court turns to the facts of this case.

## Relevant Facts

Plaintiff Kermit Leaks has been a detainee at Cook County Jail since April 21, 2012. (Def. SOF ¶ 1.) Defendant Ed Fowler was a physician's assistant at the Jail when Plaintiff entered the Jail and through the spring of 2014. (Def SOF Ex. B, at 41; R. 36 ¶ 17.)

Leaks is 56 years old. (Def. SOF Ex. B, at 2.) Leaks has several ongoing medical conditions that preceded his entry into Cook County Jail. He has been asthmatic since he was a teenager, causing him to be short-winded, with difficult breathing sometimes. (Def. SOF ¶ 2; Def. SOF Ex. A, at 19:7-14.) He has had high blood pressure since the early 1980's; although his blood pressure is controlled with medication, Leaks still gets headaches. (Def. SOF ¶¶ 3-4; Def. SOF Ex. A, at 20:22-21:10.) In 1982 or 1983, Leaks' right lung was surgically removed after an injury. (Def. SOF ¶ 5.) Having one lung affects Leaks' daily life, causing him to feel "fatigue, tired, you know, don't want to get up sometimes." (Def. SOF ¶ 6; Def. SOF Ex. A, at 21:22-22:13.)

Fowler performed part of Plaintiff's medical evaluation during Plaintiff's intake to the Jail on April 21, 2012. (Def. SOF ¶ 8.) Plaintiff weighed 67 kilograms (approximately 148 pounds). (Def. SOF Ex. B, at 35.) During the examination, Fowler noted a diagnosis of asthma and ordered prochlorperazine (apparently and antipsycotic, anti-nausea drug), loperamide (an anti-diarrhea medication), hydroxyzine pamoate (an antihistamine), belladonna alkaloids-phenobarbital (which treat stomach or intestinal cramping). (*Id*.) Plaintiff's chest was x-rayed during his intake; the medical doctor who read the x-ray reported that Plaintiff's "left lung is clear of suspicious

infiltrates" and that there were "[n]o radiographic findings to suggest acute TB." (Def. SOF ¶ 9; Def. Status Report, Dkt. 77-2, at 1.)

On May 9, Leaks saw a nurse in the "ER CHS," and was diagnosed with hypertension. (Def. SOF ¶ 16; Def. SOF Ex. B, at 2-3.) Leaks then returned for a routine follow-up appointment on May 16. A nurse noted that he reported a cough and shortness of breath and was using albuterol frequently. (Def. SOF ¶ 17; Def. SOF Ex. B, at 15, 38-39.) She indicated that his left lung was clear. (Def. SOF Ex. B, at 39.) Leaks then saw Fowler, who noted "wheezes." (Def. SOF ¶ 18; Def. SOF Ex. B, at 40.) Fowler recorded diagnoses of hypertension and asthma. (Def. SOF Ex. B, at 40-41.) Fowler added prednisone, a beclomethasone 40 mcg/inh inhalation aerosol with adapter, and hydrochlorothlazide (a blood pressure medication) to Leaks' medications, ordered daily blood pressure checks for a week and a follow-up with primary care. (*Id.* at 41; Def. SOF ¶ 12.) Fowler told Leaks that the prednisone was to help him breathe. (Def. SOF ¶ 12; Def. SOF Ex. A, at 51:23-52:5.)

Between May 18 and May 29, Leaks saw nurses seven times for blood pressure checks. (Def. SOF ¶ 13, 43; Def. SOF Ex. B, at 15-17, 39; Def. SOF Ex. A, at 52:11-18.) On or about June 26, Leaks filed a grievance in which he complained of being asthmatic and having difficulty breathing, a rash and flaky scalp from the shower water, foot fungus from the shoes, and having to sell portions off of his food trays to other inmates to barter for their medications or money to buy items from the commissary. (Def. SOF ¶ 14; Def. SOF Ex. A, at 71:12-72:3; see also R. 9, at 13.)

On July 10, Plaintiff returned for a medical appointment with Fowler. (Def. SOF Ex. A, at 47:16-22, Ex. B, at 18.) Fowler examined him, and found "non-labored" breathing with "no wheezes or crackles." (R. 77-1, Def. Status Rpt., at 1.) Fowler noted multiple current

5

medications that included two inhalers, diphenhydramine 50 MG at bedtime for insomnia, and hydrochlorothlazide 25 MG. (*Id*. at 2.) Fowler ordered several laboratory tests, including a PSA Total, Basic Metabolic Profile, a Lipid Profile, and a Urinalysis. (*Id*.) Fowler also ordered a follow-up appointment on July 24. (*Id*.)

On July 24, the nurse who took his vital signs recorded his weight at 66.8 kilograms (147.27 pounds). (Def. SOF Ex. B, at 18.) Fowler then examined Leaks and found that his "lungs [we]re clear to auscultation," with breathing "non-labored," equal breath sounds, "no wheezes, no crackles." (Def. SOF Ex. B, at 42, 43.) He found Leaks' "probable asthma" to be well controlled. (*Id*. at 43.) Fowler continued orders for medications. A nurse took Leaks' vital signs on July 31. (Def. SOF Ex. B, at 19.) In late July (either or both of July 18 and July 28), Leaks appears to have submitted at least one grievance in which he stated that he was having a consistent, constant cough, causing his throat and chest to burn and headaches. (Def. SOF Ex. A, at 71:12-72:16; Pl. Am. Compl., at 13, 14.)

At a scheduled follow-up on August 14, Fowler made similar observations regarding Leaks' breathing and asthma and continued the medications ordered on July 24. (Def. SOF ¶ 21; Def. SOF Ex. B, at 45-46.) Leaks was escorted out by security after he became argumentative over his request for "skin cream." (Def. SOF ¶ 21; Def. SOF Ex. B, at 46.)

On August 21, Leaks presented to the ER CHS for a cough. (Def. SOF ¶ 22; Def. SOF Ex. B, at 4.) The nurse's discharge diagnosis was "asthma," with a secondary diagnosis of "bronchitis." (Def. SOF ¶ 22; Def. SOF Ex. B, at 4-5.) Leaks returned to the ER CHS on September 2 for a cough with congestion. (Def. SOF ¶ 23; Def. SOF Ex. B, at 5.) The nurses'

diagnosis was a "URI."[1] (Def. SOF ¶ 23; Def SOF Ex. B, at 6.) On September 4, Leaks's vital signs were taken. His recorded weight was 65.9 kilograms (145.3 pounds). (Def. SOF Ex. B, at 19-20.) On October 15, 2012, Leaks was taken to the ER CHS after a fall; he refused treatment. (Def. SOF ¶ 24.)

On October 25, 2012, Leaks attended a scheduled follow-up with Dr. Marghoob A. Khan (Def. SOF ¶ 25); the records provided do not disclose a prior examination by Dr. Khan. A nurse recorded his weight as 65.36 kilograms (144.1 pounds). (Def. SOF Ex. B, at 20, 46-48.) Dr. Khan noted that Leaks had "longstanding asthma," for which he "uses occasional albuterol . . . no night time symptom." (*Id*. at 47.) He found that Leaks' "[r]espirations [we]re non-labored," with breath sounds free of wheezes or crackles. (*Id*. at 48.) He diagnosed asthma, with a good degree of control. (*Id*.) Dr. Khan's plan included an HIV 1/2 antibody screen, CMP,[2] CBC with differential,[3] and a chest x-ray. (Def. SOF ¶ 26; Def. SOF Ex. B, at 48) Dr. Khan continued Plaintiff's inhalers and ordered a topical cream. (*Id*.) On October 26, a doctor in diagnostic radiology found that the x-ray showed that Leaks' left lung was "clear," with "[n]o pleural effusion or pneumothorax. The bony thorax is unremarkable. Impression: stable right lobectomy changes." (Def. SOF ¶ 27; Def. Status Rpt., 77-2, at 2-3.) The results of the other ordered tests

---

[1] This appears to stand for upper respiratory infection.
[2] The Court understands this to be a comprehensive metabolic panel that would provide information regarding the liver and kidneys, blood sugar and protein levels, and electrolyte and fluid balance. *See* Comprehensive Metabolic Panel, available at http://www.webmd.com/a-to-z-guides/comprehensive-metabolic-panel-topic-overview (visited March 2, 2016).
[3] A complete blood count provides information regarding the kinds and numbers of cells in the blood, including red blood cells, white blood cells, and platelets. See Complete Blood Count (CBC), available at http://www.webmd.com/a-to-z-guides/complete-blood-count-cbc (visited March 2, 2016).

do not appear in the record. Dr. Khan scheduled a routine follow-up on November 26. (Def. SOF Ex. B, at 48.)

On November 19, Leaks returned for an appointment with Fowler. (Def. SOF ¶ 28.) A nurse recorded Plaintiff's weight as 65.1 kg (143.52 pounds). (Def. SOF Ex. B, at 20-21.) Fowler examined Leaks and diagnosed asthma with good degree of control; his plan included continuation of his inhalers, along with ibuprofen, and a February follow-up. (Def. SOF ¶ 28; Def. SOF Ex. B, at 36.)

On November 26, Plaintiff returned for a follow-up with Dr. Khan. (Def. SOF ¶ 30.) A nurse recorded his weight as 65.09 kg (143.5 pounds). (Def. SOF Ex. B, at 21, 50.) Dr. Khan's notes indicate that Leaks complained of a "runny nose, mild cough, sore throat [and] body ache for a few days" but "denie[d] any fever, chills, SOB, HA, C.P. or other cardiopulmonary complaints." (*Id*. at 49; Def. SOF ¶ 30.) Leaks reported that his right lung had been removed. (Def. SOF Ex. B, at 49.) Dr. Khan's examination found "mild pharyngeal erythema," and no wheezes or crackles in Leaks' breathing. (*Id*. at 50.) Dr. Khan's diagnosis was "LIKELY BRONCHITIS, ELEVATED BP NO H/O HTN, S/P R LOBECTOMY." (*Id*.; Def. SOF ¶ 31.) He gave Leaks an amoxicillin blister pack, CTM (a multivitamin product) and Tylenol, and ordered an urgent follow-up appointment on December 11. (Def. SOF ¶ 31; Def. SOF Ex. B, at 51.) He noted in his special instructions that Leaks was to return to the clinic or go to the ER for any high fever, chills or if symptoms worsened. (Def. SOF Ex. B, at 51.) Each time Plaintiff saw Fowler or another doctor, he was instructed to return to the clinic or go to the ER if he experienced shortness of breath or worsening symptoms. (*See, e.g*., Def. SOF, Ex. B, at 35, 36, 41, 43, 46, 48.)

8

The parties appear to agree that Leaks last saw Fowler at the appointment on November 19. Leaks, however, recalls additional encounters with Fowler between April and November 19. Leaks testified that he also saw Fowler at the dispensary multiple times in that time frame, as he sought treatment for his cough. (Def. SOF Ex. A, at 33:7-34:1, 52:16-23, 54:8-16.) At those visits, nurses sometimes gave him cold pills without him seeing Fowler; other times Fowler would look out and tell them to give him cold pills. (*Id.* at 33:20-34:1, 52:11-23.) Fowler told him that coughing was good for him. (*Id.* at 34:16-22.) Leaks also recollects describing to Fowler on multiple occasions between April and November, that he was coughing, could not sleep, was having night sweats, and was losing weight. (*Id.* at 34:8-15; see also Def. SOF ¶ 10.) He told Fowler the cough worsened at night, and he was losing his appetite. (Def. SOF Ex. A, at 49:2-51:22.) Leaks did not think much of his lack of appetite, given that he did not care for the Jail food, and he attributed some of his symptoms to his single lung and asthma, but did not believe a cold would last so long. (Def. SOF ¶ 44; Def. SOF Ex. A, at 75:10-23.) Leaks testified that Fowler threatened him with seg[regation] if he kept complaining the cold pills did not work. (*Id.* at 53:10-23, 54:8-10; 55:1-12.) Leaks did not recall visits with other medical personnel during this time frame but admitted that a long time had passed since 2012. (Def. SOF ¶ 15; Def. SOF Ex. A, at 59:7-24, 61:1-62:3.)

On December 4, 2012, Leaks twice lost consciousness and collapsed. (Def SOF ¶ 33; Def. SOF Ex. A, at 35:8-16, 67:12-68:5.) After the first incident, Leaks told the prison staff that he did not need to go to the doctor, but they called a nurse anyway. (Def. SOF, Ex. A, at 67:14-68:2.) While he was waiting for the nurse, he blacked out again and was taken to the dispensary. (*Id.* at 68:1-4.) Tests revealed an elevated white blood cell count, and, on December

5, he was sent to Stroger Hospital. (Def. SOF ¶¶ 33, 34.) Personnel at Stroger suspected that Plaintiff's cough might be caused by pneumonia, tuberculosis, chronic sinusitis and post-nasal drip, or acute bronchitis. (*Id.* ¶¶ 36-40.) X-rays and CT scans indicated that Leaks' lungs were clear of infiltrates or focal lesions and that his chest was free of nodulesor masses; tests for tuberculosis and acute bronchitis came back negative. (Def. SOF ¶ 41; Def. SOF Ex. B, at 56, 58, 62, 63, 65, 66.) Leaks, however, recalls a doctor at Stroger, Dr. Shah, telling him that he had pneumonia that worsened into an infection after being left untreated.[4] (Def. SOF Ex. A, at 39:24-40:23.) The record does not appear to contain a clear ultimate diagnosis regarding the source of Leaks' cough.

Leaks also was diagnosed with chronic myeloid leukemia at Stroger. (Def. SOF ¶ 34.) Leaks had "no blasts" and was not in "blast crisis."[5] (Def. SOF Ex. B, at 58, 59.) Leaks did not have an enlarged spleen, (*see* Def. SOF Ex. B, at 63, 66 ("Spleen is normal on CT"); *id.* at 56 (noting "[a]bsence of Splenomegaly")). One Stroger doctor hypothesized that Leaks' cough might be a secondary symptom of the "underlying lymphoma." (Def. SOF Ex. B, at 58.) On December 8, Leaks was returned to the Cermak ER, where his leukemia treatment continued. (Def. SOF ¶ 42.) His cough eventually subsided. (Def. SOF ¶ 45; Def. SOF Ex. A, at 38:12-15, 39:11-15.) Leaks' leukemia is well addressed with medication, although Leaks is fatigued. (Def. SOF ¶ 46.) Leaks has not had any interactions with Fowler since his leukemia diagnosis. (Def. SOF ¶ 28; Def. SOF Ex. A, at 39:2-4; Pl. Resp. Def. MSJ, at 3.)

---

[4] The short record before the Court does not contain notes or documents by Dr. Shah.
[5] This suggests that Leaks was in the early or "chronic" phase of the disease rather than an accelerated or blast crisis phase, although the records do not specify the stage. See http://www.webmd.com/cancer/lymphoma/features/cml-chronic-phase-coping-tips (visited March 4, 2016.

In February 2013, Plaintiff brought this lawsuit claiming that several Defendants were deliberately indifferent to a serious medication condition—a painful ongoing cough stemming from undiagnosed pneumonia. He was allowed to proceed on that claim against Defendants "Mr. John Doe 'Mr. Ed'" and Ms. Jane Doe, a nurse. (R. 8) Plaintiff later identified the John Doe as Edward Fowler and informed the Court that he had "decided to drop defendant Jane Doe from his complaint." (R. 25.) Although Plaintiff mentioned his leukemia diagnosis once toward the end of his complaint, he did not then seem to complain of any deliberate indifference as to that medical condition. (R. 9, at 9.) Plaintiff seems to now suggest (from the time of his deposition) that Fowler may have been deliberately indifferent to his symptoms pointing to leukemia.

## Discussion

Defendant now moves for summary judgment in his favor and against Leaks, arguing that Leaks has not shown a "physical injury" as required by the PLRA, 42 U.S.C. § 1997e(e), and that he has not established that Defendant was deliberately indifferent to a serious medical condition. (R. 54.)

"A prison official may be found in violation of an inmate's right to be free from cruel and unusual punishment if she acts (or fails to act) with 'deliberate indifference to [his] serious medical needs.'" *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015) (alteration in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see also Rowe v. Gibson*, 798 F.3d 622, 627 (7th Cir. 2015). Here, because Plaintiff was a pretrial detainee, his claims arise under the Fourteenth Amendment, rather than the Eighth Amendment; however, allegations that jail officials were deliberately indifferent to a serious medical condition are sufficient to state a claim under the Fourteenth Amendment. *County of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998); *see also Zentmyer v.*

*Kendall Cty., Ill.*, 220 F.3d 805, 810 (7th Cir. 2000) ("Although the Eighth Amendment does not extend to pretrial detainees like [plaintiff], the Due Process Clause of the Fourteenth Amendment protects pretrial detainees under the same standard as the Eighth Amendment."). This claim has objective and subjective components, which require a plaintiff to show (1) that he had an objectively serious medical condition; and (2) that officials acted with deliberate indifference to his corresponding medical needs. *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000) (citing *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999)).

### A. Objectively Serious Medical Need

"'A serious medical condition is one that a physician has diagnosed as mandating treatment or one that is so obvious that even a lay person would know that a doctor's attention was needed.'" *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005)). A condition also may be objectively serious if a "failure to treat it 'could result in further significant injury or the unnecessary and wanton infliction of pain.'" *Hayes*, 546 F.3d at 522 (quotation marks and citation omitted). Where an inmate relies upon a delay in treatment to show an objectively serious medical condition, generally he must show that the claimed delay had a detrimental effect on or worsened his condition. *See Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009); *see also Reece v. Groose*, 60 F.3d 487, 491-92 (7th Cir. 1995) (stating in *dictum* that such evidence "goes to the objective component of the alleged medical-needs violation of the Eighth Amendment").

Relying upon *Gibson v. Ramsey*, No. 99 C 5315, 2004 WL 407025, at *7 (N.D. Ill. Jan. 29, 2004), Defendant argues that Plaintiff's "alleg[ations] that he did not receive proper treatment for his cough" fail to "identify any actual physical injuries caused by Ed Fowler's treatment of

Plaintiff." (R. 54, at 6.) Defendant concludes that Leaks' "dissatisfaction with Ed Fowler's treatment of Plaintiff's respiratory condition . . . does not meet the objective standard for deliberate indifference." (*Id*. at 6-7.)[6] Plaintiff responds that he suffered "persistent agonizing pain and discomfort" related to his "constant coughing" between May and December. (R. 64, at 2; R. 74, at 3.) The pain prevented him from sleeping, made his "whole insides" sore and painful, and causing a severe sore throat. (R. 74, at 3.) Citing medical records, he insists that, at Stroger, he was "diagnose[d] with a serious medical condition." (R. 64, at 3.)

The Court's review was hampered by the limited record presented for review. The record, interpretation of which may require more medical expertise than the Court possesses, is unclear as to the exact medical condition that was at the root of Plaintiff's ongoing and "agonizing" cough. Together with the symptoms Leaks suffered, there is a genuine dispute of fact regarding whether Leaks' cough stemmed from an objectively serious medical condition, as discussed below.

Although Fowler's notes do not reflect Leaks' complaint of a cough, Fowler himself attributed Leaks' respiratory difficulties to asthma. Leaks also was examined by Cermak nurses,

---

[6] Defendant's argument incorrectly blends two concepts: (1) the first element of a deliberate indifference claim, which requires an objectively serious medical need; and (2) 42 U.S.C. § 1997e(e)'s limitation on recovery, which has been interpreted to curtail the types of relief available to prisoners who do not show a physical injury. *See Oliver v. Wolfenbarger*, No. 07-12672, 2008 WL 4387210, at *10 n.4 (E.D. Mich. Sept. 24, 2008). ("As its title suggests, § 1997e(e) is a 'limitation on recovery.' Accordingly, physical injury is merely a predicate for an award of damages for mental or emotional injury, not a filing prerequisite for the federal civil action itself."). While, if appropriate at a future date, Defendant may argue that § 1997e(e) limits certain remedies available to Plaintiff, it is not, alone, a basis for dismissal on summary judgment, where, as here, the evidence suggests a possible physical injury, and other forms of relief may be available to Plaintiff even in the absence of physical injury. *Calhoun v. DeTella*, 319 F.3d 936, 941-42 (7th Cir. 2003) ("Just as a 'deprivation of First Amendment rights standing alone is a cognizable injury,' [], so too is the violation of a person's right to be free from cruel and unusual punishment." [] (quoting *Rowe v. Shake*, 196 F.3d 778, 781 (7th Cir. 1999); citing *Harper v. Showers,* 174 F.3d 716, 719 (5th Cir.1999)). The Court notes that Leaks explicitly seeks punitive damages and "any relief" the Court deems just. (R. 9, at 11.)

in visits interspersed with Leaks' examinations with Fowler; the nurses attributed Leaks' cough to asthma, bronchitis, or an upper respiratory infection. When Plaintiff later was examined at Stroger, doctors there were concerned that Leaks' cough resulted from pneumonia, tuberculosis, acute bronchitis, chronic sinusitis with post nasal drip,[7] or even was a secondary symptom of the leukemia. Leukemia and pneumonia are unquestionably serious medical conditions. Defendant suggests that Leaks ultimately was diagnosed with chronic sinusitis with post nasal drip, but Leaks insists that a Stroger doctor there told him that he had pneumonia and infection. Medical personnel at both Cermak and Stroger noted and seem to have treated Leaks' chronic cough, and a lay person might infer that a racking cough lasting more than six months was serious.

Further, unlike the plaintiff in *Gibson*, whose sore back was alleviated with Tylenol alone, 2004 WL 407025, at *7, Leaks insists that he suffered from a persistent, "agonizing" and "excruciating" cough that caused a sore throat, racked his entire body, and prevented him from sleeping. In light of the apparent dispute regarding the root cause of Leaks' painful cough, at the very least, a genuine issue of material fact exists as to whether Leaks' medical condition was "serious" for the purposes of § 1983. Moreover, from the current record, a reasonable jury might find that a delay of treatment for Leaks' cough caused Leaks' condition to worsen.

**B.    Deliberate Indifference**

Again, although reasonable minds could differ, given the near-constant care Leaks received, a jury could infer that Fowler was deliberately indifferent to Leaks' serious medical

---

7 Some courts have found sinusitis not to be a serious medical condition. *See Kemp v. Wright*, No. 01 CV 562(JG), 2005 WL 893571, at *6 (E.D.N.Y. Apr. 19, 2005) (finding that plaintiff's "sinusitis was not a sufficiently serious medical condition"); *Penland v. Bureau of Prisons*, No. 1:08cv1263 (LO/TCB), 2010 WL 1039866, at * (E.D. Va. Mar. 17, 2010) (citing cases and noting that "[s]everal courts have held that conditions akin to plaintiff's [chronic sinusitis and excessive tearing] are not sufficiently serious medical needs for purposes of § 1983 or *Bivens* relief").

condition. While, "neither medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference, Leaks "'is not required to show that he was literally ignored.'" *Greeno*, 414 F.3d at 653-54 (quoting *Sherrod*, 223 F.3d at 611). Deliberate indifference may be shown through inaction, *see Gayton v. McCoy*, 593 F.3d 610, 623-24 (7th Cir. 2010), "dogged persist[ence] in a course of treatment known to be ineffective," *Greeno*, 414 F.3d at 655, or by delaying necessary treatment and thereby aggravating the medical condition or needlessly prolonging the inmate's pain. *Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012); *see also Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (noting that "[t]he receipt of some medical care does not automatically defeat a claim of deliberate indifference," which still lies where "prison official, having knowledge of a significant risk to inmate health or safety, administers 'blatantly inappropriate' medical treatment, [], acts in a manner contrary to the recommendation of specialists, [], or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering") (internal citations omitted). A prisoner need not "provide 'objective' evidence of his pain and suffering—self-reporting is often the only indicator a doctor has of a patient's condition." *Id*. (citing *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996).

Defendant argues that Leaks' overall care, consisting of multiple visits with Cermak medical personnel, defeats any claim that Defendant was deliberately indifferent, even if Fowler failed to diagnose a medical condition. Defendant does not, however, explain the treatment provided and describe, with citations to evidence in the record, the treatment Fowler provided specifically for Leaks' cough. Leaks counters by arguing that the evidence suggests that Fowler persisted in a course of treatment known to be ineffective by "continuing to treat a constant

uncontrollable cough[] with a few cold pills and a week's supply of antibiotic and prednisone a couple of times in a course of 8 months." (R. 64, at 5.) Despite Leaks informing Fowler "that the medication was not working," Leaks insists, Fowler tried nothing different to address the cough and further told him nothing was wrong and that "coughing is good for you." (*Id*. at 6.) According to Leaks, this left him in unnecessary pain, prolonging his suffering. (*Id*. at 3, 6.)

Although Leaks did not suffer for the eighteen months that Greeno did, a reasonable jury nonetheless could infer Fowler's deliberate indifference as to Leaks' ongoing and painful cough from these facts, despite the frequent care Leaks received.[8] *See Greeno*, 414 F.3d at 654 (holding that nurse's "decision to withhold Maalox and give [plaintiff] a medication known to aggravate his

---

[8] It is a much closer call regarding whether a jury might reasonably find that Fowler was deliberately indifferent to Leaks' leukemia. As the leukemia progresses, a person may experience fatigue, unexplained weight loss, fever, shortness of breath, night sweats, loss of appetite, an enlarged spleen, and tiredness are symptoms of leukemia. See Chronic Myeloid Leukemia Symptoms, http://www.webmd.com/cancer/lymphoma/cml-need-to-know-first?page=2 (visited March 4, 2016.) But Leaks already suffered shortness of breath and tiredness due to his asthma and single lung, and he does not appear to have attributed these symptoms while at the Jail to anything but that, at least until nearer to December. Moreover, although he sold food from his tray, he self-reported that this was because he wanted commissary items, not because he lacked an appetite. And, while Leaks suggests he lost 35-40 pounds between April and December, the medical records suggest he lost only about 4.5 pounds. Leaks' spleen was not enlarged. Finally, the medical records themselves do not suggest that Leaks complained of night sweats until November 26. However, Dr. Khan ordered a CBC with differential at the end of October. That test should have revealed Leaks' blood cell counts at that time, but the results do not appear in the record. Without more information, the Court cannot say that a reasonable jury could not infer that Fowler was deliberately indifferent to Leaks' serious medical needs in failing to order similar testing earlier. Also, Leaks saw Fowler approximately three weeks after Dr. Khan ordered the CBC. If the test results suggested a need for immediate follow-up based on blood cell counts and were available to Fowler at the November appointment, a jury might infer deliberate indifference from Fowler's failure to act. Of course, Leaks saw Dr. Khan again just a week later; Dr. Khan also did not refer to the blood tests in the records provided. The Court simply cannot tell from this record whether Fowler might be responsible for any delay in testing or treatment, whether such delay might have worsened Leaks' condition—although the immediate and apparently ongoing efficacy of the leukemia treatment suggests Leaks was not in an accelerated stage of leukemia—much less whether any delay resulted from deliberate indifference rather negligence.

esophageal condition, taken together with her threat that [plaintiff] would be 'locked up' if he continued to complain, could support the conclusion that she was deliberately indifferent to [plaintiff's] serious medical needs") (citing *Gil v. Reed*, 381 F.3d 649, 661-63 (7th Cir. 2004)); *Rowe*, 798 F.3d at 628 ("Since Rowe's pain strongly indicated that he was experiencing reflux, the reflux could have had serious medical consequences (up to and including cancer) in addition to inflicting chronic pain on him," and "[p]risoners aren't supposed to be tortured."); *Smith v. Knox Cnty. Jail,* 666 F.3d 1037, 1040 (7th Cir. 2012) ("Even a few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference."). After all, medical records suggest that Plaintiff was seeking treatment for his painful cough at least as early as May 16, and that he actually reported to the emergency room for treatment. Fowler's records of his visits with Leaks make no mention of Leaks complaining of a cough, and the record provides insufficient information for the Court to determine why this might be or what treatment, if any, Fowler provided related to Leaks' cough or the attendant pain.

While Fowler's mere misdiagnosis, if that is what happened, would not itself be sufficient to state a claim, the record simply does not provide enough evidence to rule out a question of fact. Dr. Khan and the Stroger doctors identified multiple possible causes for Leaks' cough and ordered multiple tests and x-rays to test their theories. Further evidence may show that Fowler took reasonable action to adjust Leaks' medication, treat his symptoms, or identify the source of his cough based upon what he knew. The jury also might infer from the fact that so many doctors attributed Leaks' cough to so many potential causes that Fowler, who was a physician's assistant rather than a doctor, was not deliberately indifferent to Leaks' condition. That remains for a jury to decide.

## CONCLUSION

For the reasons stated in this Memorandum Opinion and Order, Defendant's motion for summary judgment [52] is denied. Plaintiff's response to Defendant's motion for summary judgment, which is styled as a motion [64], is stricken as pending motion, as the Court has already denied Defendant's motion. The Court exercises its discretion to recruit counsel for Plaintiff. The Court requests that Robert John Prendergast, Daley Mohan Groble PC, 55 West Monroe Street, Suite 1600, Chicago, IL 60603-5001, represent Plaintiff in accordance with counsel's trial bar obligations under the District Court's Local Rule 83.37 (N.D. Ill.). The Attorney Video Conference Room is now available at both the Chicago and Rockford courthouse. The case is set for status on 5/31/16 at 9:15 a.m.


Date: 3/8/2016 /s/ James B. Zagel